FILED
2020 Nov-09  AM 09:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

| | |
|---|---|
| **CHARLES CAMERON COOKE,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION NUMBER:** |
| ) | **5:19-CV-00115-AKK** |
| **CARPENTER TECHNOLOGY** ) | |
| **CORPORATION,** ) | |
| ) | |
| **Defendant.** ) | |

## <u>MEMORANDUM OPINION</u>

Charles Cameron Cooke took a medical leave from his job at a manufacturing plant to address some health problems.  When he tried to return to work, he asked his employer, Carpenter Technology Corporation, if he could work a straight shift, as his doctors recommended, rather than rotate between day shifts and night shifts. Carpenter offered to take Cooke off the rotating shift for 30 days, but would not guarantee that Cooke could work a straight shift after the 30-day period ended. Cooke's doctor informed him that the shift assignment needed to be permanent, and Cooke relayed that information to Carpenter.  Carpenter then asked for more time to consider Cooke's request.  Faced with choosing between accepting Carpenter's initial terms and ignoring his doctors' advice, Cooke found another job and resigned while Carpenter was still evaluating his request for a permanent assignment.

Cooke filed this lawsuit alleging that, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C § 12203, Carpenter discriminated against him because of his disability and retaliated against him for requesting accommodations. Doc. 21 at 5. Cooke also alleges that Carpenter violated the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2611, by interfering with his right to leave and retaliating against him "due to his need for leave." Doc. 21 at 6. Carpenter moves for summary judgment on all claims. Doc. 26. For the reasons explained below, the motion is due to be granted.

## I.

Carpenter, a manufacturer and distributor of stainless steels and specialty alloys, hired Cooke to work at its plant in Athens, Alabama as an ultrasonic technician in the non-destructive testing ("NDT") unit. Doc. 28-1 at 3–4. Cooke's job was to certify that the product was not defective. Doc. 28-3 at 15:3–16:19. The Athens plant operates round-the-clock, and the employees in the NDT unit rotate between a day shift and night shift. Doc. 28-1 at 3–4. To maintain morale, Carpenter requires that all employees in the NDT unit rotate shifts. *Id.* For two years, Cooke did his job without incident and was by all accounts a good employee. Doc. 28-8 at 74:15–23; doc. 28-9 at 13:19–14:18.

In May 2017, Cooke started having suicidal thoughts and "starving himself." Doc. 28-3 at 23:6–24:1. Cooke reported these issues to his superiors, who

encouraged him to seek psychiatric treatment through the employee assistance program, which he did. *Id.* at 23:10–17, 27:1–14. Cooke was diagnosed with depression, anxiety, and anorexia. *Id.* at 25:4; doc. 28-4 at 26.

Carpenter also encouraged Cooke to apply for FMLA. Doc. 28-3 at 27:1–3. Carpenter used a third party, Liberty Mutual, to handle FMLA claims and claims for short- and long-term disability. Doc. 28-1 at 3. Cooke testified that he applied for FMLA through a digital portal at work. Doc. 28-3 at 27:1–5, 28:2–8. His application was approved, and Cooke was on FMLA leave from June 25, 2017 until he exhausted his leave on September 15, 2017. Doc. 28-3 at 28:11–13; doc. 28-1 at 4.[1]

After Cooke applied for FMLA leave, human resources told him that the company had removed him from the work schedule and advised him to apply for short-term disability as well. Doc. 28-3 at 31:8–10. Because human resources had "initiated" the short-term disability application, Cooke did not realize "that [he] had to actually go and apply for it." *Id.* at 31:12–15. Human resources followed up two weeks later and "instructed [Cooke] on how to apply." *Id.* at 31:16–22.[2] Cooke

---

[1] In an affidavit he submitted in opposition to Carpenter's motion, Cooke maintains that he told human resources he needed to use intermittent FMLA leave, but that human resources submitted paperwork for continuous FMLA leave instead, without his authorization. Doc. 31-1 at 3. Cooke says he did not realize that human resources had filled out the forms for continuous leave until after he filed this lawsuit. *Id.* at 4. These allegations are inconsistent with Cooke's deposition, where he testified that *he* applied for FMLA through a digital application. Doc. 28-3 at 28:2–8.

[2] Cooke maintains in his affidavit that "[i]t was not my choice to file for short term disability." Doc. 31-1 at 4. Again, his deposition testimony quoted above shows that Cooke voluntarily applied for short-term disability.

eventually enrolled in short-term disability and received disability benefits from July to November 2017.  Doc. 28-1 at 4–5.

Facing financial difficulties, Cooke reached out to human resources in November to ask if he could return to work.  Doc. 28-3 at 42: 2–5, 47:8–14.  Human resources asked him to provide a letter from his doctor authorizing his return.  *Id.* at 47:11–17.  Within a few weeks, Cooke had the requested letters.  *Id.* at 49:20–50:3. Human resources told him to read the letters over the phone.  *Id.* at 50:5.  The first letter stated:

> Mr. Cooke is able to return to work, however he would benefit from a consistent work schedule (working same shift as opposed to a swing shift schedule).  We will continue to evaluate/monitor him during this transition period.

Doc. 28-4 at 15.  The second letter read:

> At this time, Cameron can return to work.  However, it is recommended he not return to a swing shift which could directly affect his progress and future success.  Cameron needs structure and consistency to reduce factors which could escalate and/or contribute to his well-being.

Doc. 28-4 at 25.  Human resources found the letters conflicting, since one letter "recommended" that Cooke work a straight shift, while the other letter said only that Cooke "would benefit" from working a straight shift.  Doc. 28-5 at 143:8–17.  As a result, it was not clear to human resources "whether it was a restriction or not a restriction."  *Id.* at 143:16–17.  Human resources consulted with management and with Carpenter's legal department to determine what to do.  *See* doc. 28-1 at 5.

Meanwhile, human resources suggested that Cooke apply for long-term disability, which he did.  Doc. 28-3 at 42:12–19.  His application was denied for lacking the requisite medical documentation.  *Id.* at 42:20–23.  In January 2018, human resources asked Cooke for updated medical records.  *Id.* at 55:9–11, 111:1–18.  Cooke did not provide these records for over a month, at least in part because he was forced to change medical providers.  *Id.* at 108:2–22, 111:21–22.  His updated letter provided:

> Mr. Cooke can return to work, with the restriction of working a consistent work schedule, he is unable to work a swing schedule at this time. We will continue to evaluate / monitor him during this transition period.

Doc. 28-4 at 27.

Human resources then discussed Cooke's limitations with his supervisor, Ken Berry, and the plant manager, Jim America, advising that Carpenter had to be "very careful about making accommodations" to the rotating shift schedule.  Doc. 28-7 at 61.  That was because other employees in the NDT unit had previously requested accommodations for nonmedical reasons.  Doc. 28-8 at 97:6–21.  Berry replied that, although he was "open to ideas," he preferred that Cooke rotate because Carpenter had "gotten away from people not having to rotate."  Doc. 28-7 at 61.  The next month, Berry asked the other employees in the NDT unit if they would be willing to swap shifts with Cooke so that he could work only nights.  Doc. 28-9 at 30:12–33:2.

They all agreed. *Id.* One of the employees texted Cooke to let him know. Doc. 28-4 at 28–30.

Nevertheless, Carpenter offered Cooke only a temporary accommodation. Under Carpenter's proposal, Cooke would work a straight shift, either days or nights, for 30 days. Doc. 28-3 at 62:15–23. Afterward, he would have to take leave again until his medical condition no longer precluded him from rotating. *Id.* at 63:1–3. Because Cooke had already exhausted his FMLA leave, Carpenter's accommodation effectively meant that after 30 days Cooke would either have to ignore his doctor's advice, or be terminated or forced to resign if his medical restrictions remained in place. *Id.* at 63:1–65:2.

Cooke's doctor refused to release him for work under Carpenter's proposal, *id.* at 67:13–18, so Cooke and Carpenter continued discussing their options. During a phone call in early March, the plant manager told Cooke that Carpenter was unable to offer a permanent accommodation but that it would be in touch soon with a final answer. *Id.* at 64:19–65:14, 122:5–9; doc. 28-1 at 6. Likewise, human resources said in an email that it "need[ed] a little more time to provide an answer." Doc. 28-4 at 34. Cooke followed up with human resources several days later, and human resources requested more time. *Id.* at 33. Cooke sought another update the next day, reiterating his desire to return to work because he was "again reaching the financially

critical level." *Id.*  After receiving no response, Cooke emailed his resignation the next morning and accepted another job.  *Id.* at 36–37; doc. 28-3 at 126:12–127:15.

## II.

In his amended complaint, Cooke asserts claims of discrimination and retaliation under the ADA, and claims of interference and retaliation under the FMLA.  Doc. 21 at 4–7.  Carpenter moves for summary judgment on each claim,[3] doc. 26, which the court will address in turn.

## A.

## 1.

The court begins with Cooke's allegations that Carpenter failed to offer him a reasonable accommodation, in violation of the ADA.[4]  Doc. 21 at 5.  The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . [the] terms, conditions, and privileges of employment."   42 U.S.C.  § 12112(a).   To establish a prima facie case of

---

[3] Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  A genuine dispute of material fact exists if a "reasonable jury could return a verdict for the nonmoving party" under the governing law.  *Bowen v. Manheim Remarketing, Inc.*, 882 F.3d 1358, 1362 (11th Cir. 2018) (quotation omitted).  When resolving a motion for summary judgment, the court must construe the evidence in the light most favorable to the nonmoving party.  *Id.*

[4] In his amended complaint, Cooke also alleges a constructive-discharge theory of discrimination.  Doc. 21 at 5.  However, Cooke has since abandoned that theory by failing to pursue it at summary judgment.  *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."); *see also id.* at 592 ("In opposing a motion for summary judgment, a party may not rely on his pleadings to avoid judgment against him.") (quotation omitted).

discrimination under the ADA, the plaintiff must show (1) that he is disabled; (2) that he is a qualified individual; and (3) that the employer discriminated against him because of his disability. *Holly v. Clairson Indus., LLC*, 492 F.3d 1247, 1255–56 (11th Cir. 2007). Carpenter raises two main points in support of its contention that Cooke cannot establish it discriminated against him.

### a.

First, focusing on the second element of the prima facie case, Carpenter argues that Cooke is not a qualified individual because he cannot perform the "essential functions" of the job. Doc. 27 at 13–20.[5] An individual is qualified if she, "with or without reasonable accommodation, can perform the essential functions" of the job. 42 U.S.C. § 12111(8); *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000). An employer must provide "reasonable accommodations" to otherwise qualified employees with a disability unless "the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A); *Earl*, 207 F.3d at 1365. The duty to provide accommodations does not, however, "require the employer to eliminate an essential function" of the job. *D'Angelo v. ConAgra*

---

[5] Relevant to the third element, Carpenter argues that Cooke failed to produce direct evidence of discrimination. Doc. 27 at 11–13. However, for a failure-to-accommodate claim, Cooke need not produce evidence of discriminatory intent, direct or otherwise, since "an employer's failure to reasonably accommodate a disabled individual *itself* constitutes discrimination under the ADA." *Holly*, 492 F.3d at 1262; *see* 42 U.S.C. § 12112(b)(5)(A) (providing that discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability").

*Foods, Inc.*, 422 F.3d 1220, 1229 (11th Cir. 2005) (alteration and quotation omitted). Such an accommodation would be inherently unreasonable. Thus, to be qualified, the individual must be able to perform, including with the benefit of any accommodations to which she is entitled, the essential functions of the job.

Essential functions are the "fundamental job duties" that an employee "is actually required to perform." *Earl*, 492 F.3d at 1365; *see also* 29 C.F.R. § 1630.2(n)(1). "Whether a function is essential is evaluated on a case-by-case basis by examining a number of factors." *Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000). The statute and regulations mention numerous factors,[6] but the court will focus on those that are relevant here. *Cf. Holly*, 492 F.3d at 1259.

Courts give "substantial weight" to the employer's judgment as to which functions are essential. *See D'Angelo*, 422 F.3d at 1233. But courts do not blindly defer to employers. Otherwise, "an employer that did not wish to be inconvenienced

---

[6] The statute directs courts to consider (i) "the employer's judgment as to what functions of a job are essential" and (ii) any "written description" of the job prepared by the employer. 42 U.S.C. § 12111(8).

The regulations list a number of other considerations, including: (i) "[t]he amount of time spent on the job performing the function;" (ii) "[t]he consequences of not requiring the incumbent to perform the function;" (iii) "[t]he terms of a collective bargaining agreement;" (iv) "[t]he work experience of past incumbents in the job;" and (v) "[t]he current work experience of incumbents in similar jobs." 29 C.F.R. § 1630.2(n)(3).

The regulations also "identify three nonexclusive bases on which a job function may be deemed essential: (i) the reason the position exists is to perform that function; (ii) there are a limited number of employees available among whom the function can be distributed; and (iii) the function is highly specialized so that the incumbent in the position was hired for his or her expertise or ability to perform the particular function." *Holly*, 492 F.3d at 1258–59 (citing 29 C.F.R. § 1630.2(n)(2)).

by making a reasonable accommodation could, simply by asserting that the function is 'essential,' avoid the clear congressional mandate that employers make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." *Holly*, 492 F.3d at 1258 (quotation and alteration omitted). Thus, in *Holly*, though the employer said that strict punctuality was essential, the Eleventh Circuit found considerable evidence that the plaintiff's job was not time sensitive. *Id.* at 1259–61. In contrast, in another case where the employer maintained that strict punctuality was essential, the Circuit examined "the nature of [the plaintiff's] position" and determined that her "timely presence" was important to the job. *Earl*, 207 F.3d at 1366. In both cases, the Circuit considered whether the record supported the employer's claim of essentiality.

Here, Carpenter says that rotating shifts is essential for two reasons. First, the plant needs to operate continually to meet business demands, so employees must rotate between day shifts and night shifts. Doc. 28-2 at 29:2–30:5; doc. 28-1 at 3–4. This rationale does not withstand scrutiny. Enabling a continuous operation explains why the plant must have day shifts and night shifts, but it does not explain why employees must rotate between day and night shifts. If some employees worked only day shifts, and other employees worked only night shifts, the plant could still operate continuously and meet its customers' demands.

The second and perhaps real reason for requiring employees to rotate is Carpenter's desire to promote fairness and to maintain employee morale.[7]  Doc. 28-9 at 22:10–18.  In the plant manager's words, "[W]e want to give a balance, an equal opportunity for people, and that's the way to do it.  Everybody has to rotate.  You get a chance to work days, you get a chance to work nights."  Doc. 28-2 at 34:10–14.  That said, Carpenter permits employees "to swap shifts with each other on a voluntary basis" as needed.  Doc. 28-1 at 4.  Presumably, then, fairness and morale are not an issue when employees swap shifts voluntarily on a temporary basis.

When Cooke asked to return to work with the accommodation that he work a straight shift, the production manager of the NDT unit met with the other NDT employees and asked if any of them would be willing to swap with Cooke, so that, for example, they worked during the day and Cooke worked during the night.  Doc. 28-9 at 30:16–31:3.  They all agreed.  *Id.*  After that meeting, the production manager thought that Carpenter would be able to accommodate Cooke working a straight shift.  *Id.* at 37:1–5.  As in *Holly*, where a supervisor's testimony that a function did not "really matter" created an issue of material fact as to whether the function was essential, the manager's statement supports Cooke's argument that summary judgment is inappropriate on the basis that shift rotation is an essential function of

---

[7] This analysis could also fall under the factor concerning the "consequences of not requiring the incumbent to perform the function."  29 C.F.R. § 1630.2(n)(3)(iv).

Cooke's position.  *Holly*, 492 F.3d at 1257–58.  And, indeed, as to that issue, Carpenter's policy of allowing employees to swap shifts voluntarily, at least on a temporary basis, and the NDT employees' willingness to swap shifts with Cooke, creates a genuine issue of material fact as to whether rotating shifts is an essential function of the job.

On the other hand, the statute also instructs courts to consider the written description of the job.  42 U.S.C. § 12111(8).  If the function is not mentioned as a requirement in the job description, that weighs against finding the function essential. But failing to mention the function in the job description is not dispositive.  For example, in *Davis*, the Eleventh Circuit had no trouble finding that overtime was essential even though it was not listed in the job description, since the job application indicated that overtime was a condition of employment.  *Davis*, 205 F.3d at 1306. Similarly, here, though rotating shifts is not mentioned in the job description, doc. 28-7 at 55, Carpenter does explain to new employees during the hiring process that rotating shifts is required, doc. 28-2 at 57:2–12; doc. 28-3 at 20:1–3.

The regulations also instruct courts to consider the work experience of past incumbents in the job and the work experience of current incumbents in similar jobs. 29 C.F.R. § 1630.2(n)(3).  On this point, Cooke attests that Carpenter allowed three other employees to work non-rotating shifts "for periods of longer than 30 days." Doc. 31-1 at 3.  Two of these employees, Cooke concedes, worked in different

departments than his. *Id.* Carpenter maintains that these two employees are not proper comparators to Cooke since they did not have the same job. Doc. 34 at 6. But the regulations specifically contemplate considering the "work experience of incumbents in similar jobs." 29 C.F.R. § 1630.2(n)(3)(vii). Carpenter presents no timely evidence that these two employees' jobs were materially different from Cooke's.[8] Furthermore, Cooke asserts that the third employee who Carpenter allowed to work a non-rotating shift worked in the NDT unit. Doc. 31-1 at 3. The impact of Cooke's evidence is limited, however, because "an employer does not concede that a job function is non-essential simply by [offering] a temporary accommodation." *Rehrs v. Iams Co.*, 486 F.3d 353, 358 (8th Cir. 2007) (citation omitted).[9] Even so, based on the record properly before the court, the evidence that Carpenter allowed other employees to work a non-rotating shift for more than 30 days, including in Cooke's department, helps to establish a genuine dispute as to whether rotating is an essential function.

Carpenter's remaining arguments for why rotating is an essential function are unavailing. Carpenter argues that if Cooke worked "only during the day or night,"

---

[8] Despite Cooke mentioning these comparators as early as his EEOC complaint, doc. 28-4 at 9, Carpenter did not present evidence about whether these other jobs were similar until an affidavit attached to its reply brief, doc. 35-1. The court declined to consider the affidavit, because it improperly introduces new evidence in a reply brief. Doc. 36.

[9] *See also Agee v. Mercedes-Benz U.S. Intern., Inc.*, 646 F. App'x 870, 875 n.2 (11th Cir. 2016) (noting that a manager's acknowledgement that the company could provide a temporary accommodation provided "no evidence" that it would have allowed a permanent one).

his "station would be unmanned for the remainder of his shift," which would force Carpenter to either assign other NDT technicians to complete both their and Cooke's duties or force Carpenter to hire a replacement for the remainder of Cooke's shift. Doc. 27 at 18–19.  To be sure, the record shows that Carpenter hired a temporary employee to work in the NDT unit during Cooke's leave.  Doc. 28-1 at 4.  But Carpenter refuses to acknowledge that if Cooke returned from leave and worked only during the night, it could simply assign one of the other NDT technicians to work only during the day—which every NDT technician volunteered to do—and the position would be covered full time.

Carpenter also suggests that because other courts have found rotating to be essential in other jobs, this court must rule the same way here.[10]  To the contrary, the essential function inquiry "is evaluated on a case-by-case basis."  *Davis*, 205 F.3d at 1305.  Plus, the statute specifically mentions "modified work schedules" as an example of a reasonable accommodation.  42 U.S.C. § 12111(9)(B).  So, a categorical rule that rotating shift schedules are always an essential function, and

---

[10] For example, Carpenter points to *Rehrs v. Iams Co.*, 486 F.3d 353, 357–59 (8th Cir. 2007), where the Eighth Circuit held that rotating shifts was an essential function.  The employer's rationale for rotating shifts was much stronger in that case.  *See id.* at 347 (noting that in addition to promoting team morale, rotating shifts benefited both individual employees and the company by "expos[ing] employees to management, and to more resources, suppliers, and outside customers with whom the company only interfaces during the day shift").  In any event, other circuits have declined to grant summary judgment on whether rotating shifts was an essential function, though for different reasons.  *Feldman v. Olin Corp.*, 692 F.3d 748, 755–56 (7th Cir. 2012).  In the end, such precedents may establish useful principles, but the outcome depends on the facts of the case.

thus are not subject to accommodation, would fly in the face of the statute. The court thus finds that there is a genuine dispute of material fact as to whether rotating shifts is an essential function of Cooke's position.

### b.

Carpenter also raises another reason why it is entitled to summary judgment on the discrimination claim—Cooke unreasonably disrupted the interactive process. Doc. 27 at 18–22. The ADA and corresponding regulations contemplate "an informal, interactive process" in which employers and disabled employees work together to identify potential accommodations. 29 C.F.R. § 1630.2(o)(3). That process begins when an employee requests an accommodation.[11] An employee who fails to engage in the interactive process cannot later challenge his employer's failure to accommodate his disability. *See D'Onofrio*, 964 F.3d at 1022 (citing *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997)).

The parties make cross allegations regarding the disruption of the interactive process in this case. Carpenter says that Cooke obstructed the interactive process by quitting before Carpenter could adequately respond to his request for

---

[11] *See D'Onofrio v. Costco Wholesale Corp.*, 964 F.3d 1014, 1022 (11th Cir. 2020) (explaining that an employer's "'duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made' by an employee") (quoting *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999)); *see also Hudson v. Tyson Farms, Inc.*, 769 F. App'x 911, 919 (11th Cir. 2019) (noting that a request for reasonable accommodation is "the first step in an informal, interactive process between the individual and the employer") (quotation omitted).

accommodation and by declining Carpenter's offer of a 30-day accommodation. *See* doc. 27 at 21. Cooke responds that Carpenter, not Cooke, obstructed the interactive process, alleging that the company's failure to provide a reasonable accommodation within four months demonstrates bad faith. Doc. 30 at 26–27.

The facts do not support Cooke's contention. Essentially, Cooke's position is that Carpenter's proffered accommodation was unreasonable, and that Cooke justifiably resigned after reaching an impasse with Carpenter and going without pay or disability benefits for four months. As an initial matter, however, Carpenter's 30-day accommodation was not necessarily unreasonable when offered. To be sure, Cooke's doctor orally refused to release him under Carpenter's proposed conditions in March 2018. Doc. 28-3 at 67:13–67:18. But none of the three earlier letters Cooke submitted to support his request for accommodation mandated that the accommodation be permanent. In fact, two of his letters—including the last letter he submitted in February 2018—explicitly referenced a "transition period," implying that any arrangement would be temporary. Doc. 28-4 at 15, 27.

Moreover, even assuming Carpenter's initial accommodation was unreasonable, Cooke did not give Carpenter an adequate opportunity to consider an alternative. Cooke complains that after four months, Carpenter never offered him a reasonable accommodation. But some of that delay stemmed from confusion over the conflicting nature of his letters. *See* doc. 28-5 at 141:13–143:17. And Cooke

16

himself slowed the process by failing to submit an updated letter until a month after Carpenter requested one.  Doc. 111:12–113:18.  Carpenter then acted on Cooke's request with a phone call just one week after receiving the updated letter.  Doc. 28-3 at 118:6–11.  During that call, Carpenter explained that it could not offer a permanent accommodation but requested more time to consider a response after Cooke's doctor rejected its 30-day accommodation.  *Id.* at 64:19–65:14, 122:5–9.  Rather than wait, Cooke simply resigned six days later.

These facts establish that Cooke, not Carpenter, caused a breakdown in the interactive process by failing to give Carpenter an opportunity to offer a reasonable accommodation.  Although Cooke provided "substantive reasons as to why" Carpenter's 30-day accommodation was unreasonable, *Stewart*, 117 F.3d at 1286–87, that did not entitle him to walk away.  Indeed, Carpenter never denied Cooke's request for a reasonable accommodation of some sort, though it did rule out a permanent one.  Cooke instead unilaterally terminated the interactive process because he was dissatisfied with Carpenter's pace.  But ADA liability "simply cannot arise" where "an employer does not obstruct an informal interactive process; makes reasonable efforts to communicate with the employee and provide accommodations based on the information it possesses; and the employee's actions cause a breakdown in the interactive process." *Id.* at 1287.  Accordingly, the motion for summary judgment on the ADA discrimination claim is due to be granted.

**2.**

Cooke also pleads an ADA retaliation claim.  The ADA prohibits employers from retaliating against an individual for engaging in protected activity under the statute.  42 U.S.C. § 12203(a).  To succeed on a retaliation claim, Cooke must show that (1) he engaged in protected activity; (2) he suffered adverse employment action; and (3) there was a causal link between the two.  *Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir. 2016).  Cooke alleges that Carpenter retaliated against him for requesting accommodations by denying the requested accommodations and effectively forcing him to resign.

Requesting accommodations qualifies as protected activity under the statute. *Id.*  However, the denial of the requested accommodations cannot itself be the adverse employment action.  Otherwise, every denial of a requested accommodation, whether reasonable or not, would give rise to a retaliation claim.  *See McClain v. Tenax Corp.*, 304 F. Supp. 3d 1195, 1206 (S.D. Ala. 2018).  That said, the denial of an accommodation could amount to a constructive discharge.[12]  And constructive discharge, of course, qualifies as an adverse employment action.  *Rowell v. BellSouth Corp.*, 433 F.3d 794, 805 (11th Cir. 2005).  However, because Cooke abandoned his

---

[12] *See Hicks v. City of Tuscaloosa*, 870 F.3d 1253, 1261 (11th Cir. 2017) (finding that failure to accommodate could amount to constructive discharge under the Pregnancy Discrimination Act); *see also Velez-Ramirez v. Puerto Rico through Sec'y of Justice*, 827 F.3d 154, 158 (1st Cir. 2016) (holding that failure to accommodate could amount to a discharge).

constructive-discharge theory by failing to rely upon it at this stage, *see supra* note 4, and because the record before the court does not establish that Carpenter denied the requested accommodation, the ADA retaliation claim also fails.

**B.**

Finally, Carpenter seeks summary judgment on Cooke's FMLA claims.  The FMLA entitles eligible employees to "a total of 12 workweeks of leave during any 12-month period" due to a "serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1). Carpenter does not dispute that, as an employer, it is subject to the FMLA and that Cooke was an "eligible employee" entitled to leave.  Instead, this dispute centers on whether Carpenter unlawfully interfered with Cooke's right to leave or retaliated against him for taking leave.  For reasons explained below, the court concludes that Carpenter is entitled to summary judgment on these claims.

**1.**

The FMLA prohibits employers from interfering with, restraining, or denying the exercise of any right provided under the statute.  29 U.S.C. § 2615.  To succeed on his interference claim, Cooke must show by a preponderance of the evidence that Carpenter denied him a benefit he was entitled to under the FMLA.  *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1206–07 (11th Cir. 2001).  Cooke need not prove that Carpenter intended to interfere with his right

to leave under the FMLA because "the employer's motives are irrelevant" in an interference claim. *Id.* at 1208.

Cooke says that Carpenter interfered with his right to take intermittent leave by requiring him to take continuous leave for twelve weeks when he allegedly instead verbally "requested intermittent FMLA only to attend physician's appointments." Doc. 30 at 29. In an affidavit, Cooke adds that he was unaware that Carpenter enrolled him in continuous leave until after he filed this lawsuit. Doc. 31-1 at 4. Cooke also states that Carpenter required him to file for short-term disability benefits against his will after exhausting his FMLA leave rather than return to work. *Id.* at 4; doc. 30 at 29. These alleged actions purportedly violated "both the interference and anti-retaliation provisions of the FMLA." Doc. 30 at 29.

But Cooke raises these allegations for the first time in his affidavit and his corresponding response to Carpenter's summary judgment motion, and the allegations conflict with his earlier testimony. During his deposition, Cooke testified that he applied for FMLA leave through an online application after a supervisor urged him to apply. Doc. 28-3 at 27:1–23, 28:2–10. That is inconsistent with his more recent allegation in his affidavit that Carpenter completed the FMLA application for him without his permission and purportedly changed the leave request he made verbally to continuous instead of intermittent. Likewise, Cooke testified at his deposition that he applied for short-term disability benefits after

Carpenter's human resources officer "instructed [him] on how to apply." *Id.* at 31:1–22.   Moreover, Cooke testified that he facilitated the application process by providing relevant medical information. *Id.* at 32:5–17.  This is again inconsistent with his new allegations that Carpenter forced him to seek disability.   And, he applied for and received short term disability benefits during his FMLA leave, which belies his contention in his affidavit that Carpenter forced him to apply for disability benefits *after* he exhausted his leave.

Cooke does not attempt to explain or reconcile these inconsistencies in either his affidavit or response brief.  Consequently, his allegations are not enough to defeat summary judgment.  As the Eleventh Circuit has explained, when a party gives "clear answers to unambiguous questions which negate the existence of any genuine issue of material fact for summary judgment, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Liebman v. Metro. Life Ins. Co.*, 808 F.3d 1294, 1300 (11th Cir. 2015) (quotation omitted).  Based on his deposition testimony, then, there is no evidence that Carpenter interfered with Cooke's right to take leave.  Rather, Cooke took all of the FMLA leave to which he was entitled.  Only after exhausting his leave in September 2017 did Cooke ask to return to work.  Summary judgment on the FMLA interference claim is thus due to be granted.

**2.**

Cooke also alleges that Carpenter retaliated against him by placing him on continuous, not intermittent, FMLA leave and by requiring him to seek short-term disability benefits rather than return to work once he exhausted his leave.  To prove retaliation, Cooke must demonstrate that Carpenter "intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right." *Strickland*, 239 F.3d at 1207.  Put differently, succeeding on his retaliation claim requires Cooke to overcome the "increased burden of showing that his employer's actions 'were motivated by an impermissible retaliatory or discriminatory animus.'" *Id.* (quoting *King v. Preferred Tech. Grp.*, 166 F.3d 887, 891 (7th Cir. 1999)).

Here, Cooke relies on the same newly introduced allegations contained in his affidavit to support his retaliation claim.  Doc. 30 at 29; doc. 31-1 at 4.  This claim therefore suffers from the same defects as Cooke's interference claim—the allegations conflict with his deposition, where Cooke testified that he applied for FMLA leave and short-term disability benefits.  Accordingly, there is no evidence that Carpenter retaliated against Cooke for requesting leave because Cooke received the benefits he requested.  Thus, Carpenter is entitled to summary judgment on the FMLA retaliation claim.  *See Liebman*, 808 F.3d at 1300.

## III.

To conclude, Carpenter's motion for summary judgment, doc. 26, is due to be granted with respect to the retaliation claim under the ADA, and the interference and retaliation claims under the FMLA. The motion is due to be denied with respect to the discrimination claim under the ADA. The court will do so in an order issued contemporaneously with this memorandum opinion.

**DONE** the 9th day of November, 2020.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE